IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| American Resources Insurance Company, | ) | Civil Action No.: 4:08-03314-RBH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **FINDINGS OF FACT,** |
| | ) | **CONCLUSIONS OF LAW,** |
| Robert Palmer and Magdeline Palmer, | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the court following a bench trial held on August 4, 2010. Having considered the testimony of the witnesses, both in-court and by way of deposition, the exhibits, and arguments of counsel, the court issues the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that any findings of fact constitute conclusions of law, or vice-versa, they shall be so regarded.

## BACKGROUND

In September 2003, Robert and Magdeline Palmer (collectively "Defendants") purchased a convenience store, that they later named Olanta Royal Market, along with a car wash and building for the sum of $350,000. The property is situated in Florence County, South Carolina. Defendants made a down payment of $150,000, with the balance financed. At some point, Defendants obtained a commercial hazard insurance policy from American Resources Insurance Company ("Plaintiff") for the convenience store. From September 2003 through September 2007, Defendants operated Olanta Royal Market. On September 27, 2007, Olanta Royal Market was destroyed by an intentionally set fire. Thereafter, Plaintiff satisfied the mortgage balance by payment of the amount of $176,635.84. On September 30, 2008, Plaintiff commenced this

lawsuit to determine the amount of any other payments due to Defendants under the insurance policy.

## STIPULATIONS

First, the parties stipulate that the fire of September 27, 2007, is a covered cause of loss under the insurance policy. Under the policy, there is a $200,000.00 limit of coverage available for the Building. Plaintiff has previously paid $176,635.84 to satisfy the mortgage indebtedness on the Building. Plaintiff stipulates that it still owes $23,364.16, which represents the difference between the $200,000.00 limit of coverage on the Building and the amount that Plaintiff has already paid.

Second, the parties further stipulate that the highest estimate secured by Plaintiff for the costs of Debris Removal is $9,500.00 and the highest estimate secured by Defendants for Debris Removal is $16,500.00. The maximum allowable coverage for Debris Removal is $10,000.00. Plaintiff agrees that it owes, at least, the $9,500.00 if the court determines that payment is owed before Defendants actually incur the expense of Debris Removal.

All exhibits were admitted without objection.

## FINDINGS OF FACT

### The Parties

1.      Plaintiff is a corporation organized under the laws of the State of Alabama and is authorized to conduct business as an insurance company in the State of South Carolina.

2.      Defendants are citizens of Florence County, South Carolina.

3.      The court has jurisdiction over the parties and subject matter thereto, and venue is proper in the Florence Division.

**The Policy**

4.      The entire insurance policy ("the Policy") was entered into the record as Plaintiff's

Exhibit 5.

5.      The Policy provides a limit of $200,000.00 for the gas station building.  Section A(1)(a)

of the Policy defines "Building" as follows:

> a. **Building**, meaning the building or structure described in the Declarations,
> including:
>
>> (1) Completed additions;
>>
>> (2) Fixtures, including outdoor fixtures;
>>
>> (3) Permanently installed:
>>      (a) Machinery and
>>      (b) Equipment;
>>
>> (4) Personal property owned by you that is used to maintain or service the
>> building or structure or its premises, including:
>>
>>> (a) Fire extinguishing equipment;
>>> (b) Outdoor furniture;
>>> (c) Floor coverings;
>>> (d) Appliances used for refrigerating, ventilating, cooking,
>>> dishwashing or laundering . . . .

Plf's. Exh. 5 at 31.

6.      The Policy provides a limit of $130,000.00 for "Business Personal Property" in the gas

station building.  Section A(1)(b) of the Policy defines "Business Personal Property" as follows:

> b. **Your Business Personal Property** located in or on the building described in
> the Declarations or in the open (or in a vehicle) within 100 feet of the described
> premises, consisting of the following unless otherwise specified in the
> Declarations or on the Your Business Personal Property – Separation of Coverage
> form:
>
>> (1) Furniture and fixtures;

(2) Machinery and equipment;

(3) "Stock";

(4) All other personal property owned by you and used in your business;
. . . .

*Id.*

7.      The Policy provides a limit of $60,000.00 for loss of "Business Income."  The Policy

defines "Business Income" as follows:

Business Income means the:

a.  Net Income (Net Profit or Loss before income taxes) that would have
been earned or incurred; and

b.  Continuing normal operating expenses incurred, including payroll.

*Id.* at 5.

8.      The Policy provides a limit of $10,000.00 for "Debris Removal."  As to "Debris

Removal," the Policy provides the following, in pertinent part:

(1) Subject to Paragraph[] . . . (4), we will pay your expense to remove debris of
Covered Property caused by or resulting from a Covered Cause of Loss that
occurs during the policy period.  The expenses will be paid only if they are
reported to us in writing within 180 days of the date of direct physical loss or
damage.

. . . .

(4) We will pay up to an additional $10,000 for debris removal expense, for each
location, in any one occurrence of physical loss or damage to Covered Property, if
one or both of the following circumstances apply:

(a) The total of the actual debris removal expense plus the amount we pay
for direct physical loss or damage exceeds the Limit of Insurance on the
Covered Property that has sustained loss or damage.

*Id.* at 33.

4

**Valuation**

9.     The court finds that the Policy provides coverage for the actual cash value ("ACV") of damaged property. *Id.* at 11.  While the policy does provide for replacement cost coverage, Plaintiff "will not pay on a replacement cost basis for any loss or damage . . . [u]ntil the lost or damaged property is actually repaired or replaced." *Id.* at 44.  Defendants presented no evidence that any of the damaged property had been repaired or replaced.  In fact, Mrs. Palmer admitted at trial that she had not replaced any of the damaged property since the fire. Trial Tr. at 81. Accordingly, the court finds that the ACV is the applicable valuation method and awards all benefits in this matter according to such calculation.

**The Building**

10.     As discussed above, *see supra* p. 2, the court finds that the parties have stipulated and the policy calls for $200,000.00 in Building coverage and that such limits are due.  Further, having satisfied the mortgage of $176,635.84, Plaintiff owes Defendants the $23,364.16 remaining under the Building coverage. Trial Tr. at 4.

**Inventory/Merchandise (Excluding any Sporting Goods)**

11.     In January of 2007, Defendants had a third-party company, Rogail Inventory Service, complete an accounting of Olanta Royal Market's total inventory as of that time.  According to Rogail Inventory Service's report, Olanta Royal Market maintained $31,239.47 of inventory on January 10, 2007. *See* Defs'. Exh. 6.  At trial, Defendants testified that these "Sporting Goods" were fishing and hunting supplies.

12.     Mr. Pender, the insurance adjustor, was presented to the court for the purpose of providing an estimation of merchandise in the store at the time of the fire.  The court finds that

Mr. Pender is a credible witness with over forty (40) years of insurance adjusting experience, and was hired by Plaintiff to ascertain the amount of merchandise in the store at the time of the fire. Trial Tr. 159-162. Mr. Pender testified that his inventory of the merchandise amounted to $3,233.52, which included adequate allowances for merchandise destroyed by the fire. *Id.* at 164-65.

13. Mrs. Palmer also testified regarding the amount of merchandise in the store at the time of the fire. While Mrs. Palmer could not give the court an actual dollar estimate as to the amount of merchandise, she consistently testified to the fact that the store contained considerably less merchandise than normal at the time of the fire. *See*, *e.g.*, *id.* at 54-55. For example, Mrs. Palmer testified that

> [i]n comparison to what the normal amount would have been, no, there was not much stock in the store, because we were going on vacation and taking a break, so there was no need to put a lot of stock in the store, to sit on the shelves while we weren't there, to cater to the consumers. So at that time, it was a business decision to restock once we returned from vacation.

*Id.* at 55. Additionally, Mrs. Palmer admitted that Defendants had removed all of the alcohol and coke products, and some of the potato chips, from the store prior to the fire occurring. *See id.* at 51-52.

14. The court also heard testimony from Phillip Kennedy, the arson and fire expert that was hired by Plaintiff to investigate the fire at Olanta Royal Market. Mr. Kennedy testified that the photographs taken of Olanta Royal Market after the fire "indicate[d] that there was not a lot of inventory in that building." *Id.* at 21.

15. Based on all this evidence, the court finds that, excluding any sporting goods, Olanta Royal Market contained $3,233.52 in inventory at the time of the fire. Mr. Pender's estimate is

supported by the testimony of both Mrs. Palmer and Mr. Kennedy.  The court concludes that a majority of the inventory, specifically the alcohol and Coke products, were removed by Defendants prior to the fire.  In determining that $3,233.52 of inventory was in Olanta Royal Market at the time of the fire, the court notes that Mrs. Palmer was unable to give an approximate estimate as to the amount of inventory in the store at the time of the fire.  Also, while Mr. Palmer testified that he thought the store contained around $30,000.00 in inventory at the time of the fire, *see id.* at 225-26, the court finds that this testimony is not credible as it is contradicted by all three other witnesses, including Mr. Palmer's own wife.  Accordingly, the court finds by a preponderance of the evidence that, excluding sporting goods, Olanta Royal Market contained $3,233.52 in inventory at the time of the fire.

**Sporting Goods**

16.     The Rogail Inventory Service report indicated that, in January of 2007, Olanta Royal Market also contained "Sporting Goods" valued at $13,485.30. Defs'. Exh. 7.  At trial, Defendants testified that these "Sporting Goods" were fishing and hunting supplies.

17.     Plaintiff contends that Defendants removed all of the Sporting Goods prior to the September 2007 fire.  Mr. Pender testified that he found no evidence of any fishing rods or reels, which at a minimum should have left traces of metal after the fire. Trial Tr. at 165.  However, Mr. Pender and Mr. Kennedy both testified that there was some evidence of fishing tackle found in Olanta Royal Market after the fire. *See id.* at 22, 165.

18.     Both Defendants testified that the Sporting Goods were inside Olanta Royal Market at the time of the fire, and had not been removed prior to or after the fire.  Mrs. Palmer included the Sporting Goods on her first Proof of Loss submitted to Plaintiff after the fire. *See* Defs'. Exh. 8.

Defendants both indicated that the Sporting Goods lost in the fire had an ACV of $7,774.00.[1] *See* Trial Tr. at 237; *see also* Defs'. Exh. 8. The court finds that this number is also supported by the sales records for Olanta Royal Market in the year 2007. The sales records indicate Defendants sold $1,457.90 in Sporting Goods in 2007, prior to the fire. *See* Defs'. Exh. 3. When the court subtracted the amount of Sporting Goods sold in 2007–$1,457.90–from the January 10, 2007 inventory of Sporting Goods[2]–$13,485.30–it revealed a number very close to the original *retail* amount claimed by Defendants on their first Proof of Loss. Accordingly, the court finds that Defendants have met their burden of proof in establishing that there was Sporting Goods in Olanta Royal Market at the time of the fire with an ACV of $7,774.00.

**Canopy**

19.     Plaintiff argues the Canopy that affronts Olanta Royal Market should be included as part of the Building coverage, while Defendants argue it is part of the Business Personal Property.

20.     An issue remains as to the type and amount of damage caused to the Canopy by the fire. There was ample testimony that there was no damage to the intrical, steel structure of the Canopy. Mr. Kennedy, Mr. Benjamin, and Mr. Pender all testified to this fact. *See* Trial Tr. at 24, 42, 180. The court finds that all three of these individuals are well-qualified in their respective fields, and therefore finds their testimony very credible. Notwithstanding this fact, it was undisputed from the testimony and pictures presented in this case that the metal paneling

---

[1] The court notes that, originally, Mrs. Palmer indicated on her first Proof of Loss that the Sporting Goods had an ACV of $11,961.00 and a replacement cost of $7,774.00. This discrepancy was clarified at trial by Defendants. The $11,961.00 estimate was the retail value of the lost Sporting Goods, but after discounting for the normal thirty-five percent (35%) markup, the ACV of the Sporting Goods was $7,774.00. *See* Trial Tr. at 235-38.

[2] *See* Defs'. Exh. 7.

and electrical wiring of the Canopy were damaged by the fire.  For example, Mr. Pender testified that "[t]he metal fascia on the back side [of the Canopy] next to the main building was scorched pretty bad, paint burned off.  The ceiling panels underneath were worse near the building." *Id.* at 180.  Mr. Pender also testified that "[w]iring running out to the lights . . . would have to be replaced." *Id.* at 202.  The court finds that the only evidence submitted by either party regarding the cost of repairing the Canopy was submitted through the testimony of Mr. Pender.  Mr. Pender testified that he estimated it would cost between $5,000.00 and $7,000.00 to repair the metal paneling, and approximately $2,000.00 to repair the wiring. *See id.* at 181, 202.  Based on Mr. Pender's sole testimony, the court finds that the fire caused a total of $7,000.00 of damage to the Canopy–$5,000.00 to the metal paneling and $2,000.00 to the wiring.

21.      However, reviewing the Policy language, the definition of Building encompasses "[f]ixtures, including outdoor fixtures." Plf's. Exh. 5 at 31.  While the Business Personal Property definition includes "furniture and fixtures," it is noticeably silent regarding "outdoor fixtures," which is specifically mentioned under the Building definition.  This, in the court's view, reflects an intention for the canopy to fall under the Building coverage.  Additionally, from a review of the evidence, the canopy appears to the court to be an extension of the building.  Therefore, the court finds that the Canopy falls solely under the Building coverage.

**Sign**

22.      There is an issue as to whether the Sign located above the Canopy was damaged by the fire. *See* Plf's. Exh. 8-27 (picture of Sign above Canopy).  Mr. Kennedy and Mr. Pender both testified that they did not observe any damage to the Sign. *See* Trial Tr. at 23-24, 181.  Additionally, the photographs submitted show no visible evidence of damage to the Sign. *See*

Plf's. Exh. 8. The court finds that Defendants have not met their burden in showing damage to the Sign, and therefore the court finds that the Sign was not damaged by the fire.

**Equipment**

23.     Following the fire, Defendants submitted to Plaintiff a handwritten proof of loss statement dated October 29, 2007, for damage to or loss of their equipment as a result of the fire. This handwritten statement was submitted to the court as Plaintiff's Exhibit number 6. The handwritten proof of loss contains the following items and values:[3]

| Item: | ACV: | Replacement Cost: |
|---|---|---|
| Deli Case | $1,200.00 | $2,300.00 |
| Pizza Station | $1,800.00 | $3,500.00 |
| Pizza Oven | $2,000.00 | $2,500.00 |
| Upright Freezer | $700.00 | $900.00 |
| Refrig./Freezer | $300.00 | $400.00 |
| Hot Dog Roller | $600.00 | $1,000.00 |
| Microwave Oven | $50.00 | $60.00 |
| Microwave Oven | $30.00 | $60.00 |
| Meat Cutter | $700.00 | $1,400.00 |
| Credit Card Mach. | $900.00 | $1,500.00 |
| Phone Card Mach. | $900.00 | $1,500.00 |
| Cash Register | $200.00 | $300.00 |
| Coffee Maker | $150.00 | $350.00 |
| Printer/Fax/Machine | $250.00 | $300.00 |
| Surveillance Sys. | $1,000.00 | $1,400.00 |
| Pizza Showcase | $525.00 | $1,200.00 |
| 30 inch. (SS) Table | $125.00 | $150.00 |
| 78 inch. (SS) Table | $163.00 | $163.00 |
| 78 inch. (SS) Table | $163.00 | $163.00 |
| Sandwich Station | $900.00 | $1,400.00 |
| Commercial Plate | $200.00 | $350.00 |
| Chili Pot | $100.00 | $125.00 |
| Chili Pot | $60.00 | $100.00 |

---

[3] The handwritten proof of loss also contained values for the Sporting Goods. However, the court has omitted those items from this list because the court has already independently analyzed and found coverage for the Sporting Goods. *See supra* pp. 8-9.

| | | |
|---|---|---|
| 12-Pizza Pans | $150.00 | $240.00 |
| Wall Unit AC | $300.00 | $300.00 |
| Stainless Utensil | $160.00 | $300.00 |
| Eat in-Stations | $700.00 | $1,200.00 |
| . . . . | | |
| Pricing Gun | $250.00 | $360.00 |
| Calculator/Add Mech. | $75.00 | $125.00 |

Plf's. Exh. 6. Mrs. Palmer testified that she created this handwritten proof of loss based on photographs of the store and her own memory. *See* Trial Tr. at 79. Plaintiff did not dispute the ACV provided by Mrs. Palmer for these items, and Mr. Pender actually testified that he thought it was a "fair figure." Trial Tr. at 168. Accordingly, the court finds the ACV of the above items to be accurate and correct, and the court finds the total ACV of the items is <u>$14,651.00</u>. *Id.* at 167.

24. Defendants later supplemented their proof of loss with "Olanta's Royal Market Business Property List," (Plf's. Exh. 10), which contained all the items from the original handwritten proof of loss plus additional equipment. The exhibit contains the following additional items and replacement values associated thereof:

| <u>Item</u>: | <u>Replacement Cost</u>: |
|---|---|
| Bait Refrig. | $80.00 |
| Conventional Oven | $80.00 |
| Front Monitor System | $500.00 |
| Ice Cream Box | $1,000.00 |
| Ice Box | $700.00 |
| Ice Maker Stainless Steel | $4,500.00 |
| Free Standing Shelves | $5,000.00 |
| 4 Chairs | $224.00 |
| Stainless Steel Transport Cart | $300.00 |
| 3 Telephones | $235.00 |
| 5 Med Size Untouchable Plastic Trash Cans | $200.00 |
| 2 Large Size Plastic Trash Cans | $60.00 |
| Steel Space Heater | $80.00 |
| 4 Stainless Steel Napkin Holders | $100.00 |
| 4 Ashtray | $5.00 |

| | |
|---|---|
| 10 Dough Proofing Box | $100.00 |
| 3 Storage Bins | $12.00 |
| Plyboard | $90.00 |
| Cricket Storage Case | $250.00 |
| 3 Compartment Stainless Steel Sink | $550.00 |
| Storage Room Shelving | $150.00 |
| Mop, Bucket, Brooms | $50.00 |
| Cleaning Supplies | $125.00 |
| Sandwich Wraps, Foil, Plate, Sups, Seasonings | $225.00 |
| Solid Wood Desk | $200.00 |
| Steel Safe | $3,500.00 |
| Inside Store Sign | $250.00 |
| Stainless Steel Wall-Shelf in Deli Area | $125.00 |
| Pockect [sic] Thermometer 3 | $6.00 |
| 3-Coffee Pot with Stainless Steel Bottom | $48.00 |
| Kershaw Knives | $290.00 |

Plf's. Exh. 10. However, this supplemental list included only the replacement cost numbers, and not the ACV of the items. *Id.*; *see also* Trial Tr. at 152. At trial, Defendants did not provide any testimony regarding the ACV of these additional items. Thus, Mr. Pender was questioned as to the ACV of these additional items. Plaintiff, through Mr. Pender's testimony, either did not contest the values assigned by Defendants or did not offer an opinion as to the values of the following items: conventional oven ($80.00); dough proofing box ($100.00); 3 storage bins ($12.00); mop, bucket, and brooms ($50.00); plyboard ($90.00); 3 compartment stainless steel sink–Mr. Pender testified only that it would cost $200.00 to clean the stainless steel items ($550); cleaning supplies ($125.00); sandwich wraps, foil, plates, and seasonings ($225.00); steel safe ($3,500.00); inside store sign ($250.00); pocket thermometers ($6.00); and 3-coffee pots with stainless steel bottoms ($48.00). The court therefore accepts the values assigned by Defendants for those items, which totals <u>$5,036.00</u>. However, Mr. Pender further testified that the remaining additional items had ACV as follows:

| Item: | ACV: |
| --- | --- |
| Bait Refrigerator | $50.00 |
| Microwave Oven | $25.00 |
| Front Monitor System | $25.00-$50.00 |
| Ice Cream Box | $800.00 |
| Ice Box | $500.00 |
| Ice Maker Stainless Steel | $3,000.00 |
| Free Standing Shelves | $2,500.00 |
| 4 Chairs | $10-$15 a piece |
| Stainless Steel Transport Cart | $200.00 |
| 3 Telephones | $50.00 |
| 5 Medium Sized Untouched Plastic Trash Cans | $100.00 |
| 2 Large Plastic Trash Cans | $30.00 |
| Steel Space Heater | $56.00 |
| 4 Stainless Steel Napkin Holders | $25.00 |
| 4 Ashtrays | $1.00 |
| Cricket Storage Case | $150.00 |
| Storage Room Shelving | $100.00 |
| Solid Wood Desk | $100.00 |
| Stainless Steel Wall Shelf in Deli Area | $75.00 |
| Kershaw Knives | $200.00 |
| | |
| Total | $8,072.00 |

Trial Tr. at 173-80. The court accepts Mr. Pender's undisputed testimony as the the ACV of these additional items on the supplemental proof of loss, and adjusts the total ACV of these supplemental items accordingly. The court therefore finds that the additional items contained on the supplemental proof of loss have an ACV of $13,108.00.[4]

25.     In addition, Plaintiff objected to some supplemental items being claimed by Defendants, which consisted of gas,[5] 5 wall refrigeration units, bar stools, and four chairs.[6] Defendants

---

[4] In making this calculation, the court accepted the higher ACV testified to by Mr. Pender for the 4 chairs and the Front Monitor System. This total of $13,108.00 is inclusive of the $5,036.00.

[5] The court notes that it analyzes the claim for Gas in a different section of this Order. *See infra* pp. 19-21. Any general analysis in this section does *not* apply to Defendants' additional claim for the Gas.

[6] Although Defendants initially informed the court that they were claiming these additional chairs, it was discovered during the trial that the four chairs were already included in Defendants' typewritten proof of loss and were not disclosed late. *See* Plf's. Exh. 10; *see also* Trial Tr. at 175. Therefore, Defendants' claim

13

argued that there was no prejudice in the court considering these additional items because the items were included in photographs already submitted to Plaintiff and Plaintiff's insurance adjustor, Mr. Pender, was present in the courtroom and able to adjust the items during a break from trial. The court agreed. However, noting this is a bench trial, the court believes that, after further consideration prejudice did exist regarding the Gas claim, as noted at pages 19 through 21 of this Order. With regard to the other items aside from the Gas, even though those items could be considered to be a late disclosure, the court did not believe sufficient prejudice existed such that the items should not be included in Defendants' claim. Rather, Plaintiff already had been provided photographs of these items, and sufficient time existed during the trial's lunch break for the items to be adjusted by Mr. Pender. Accordingly, the court considered evidence regarding these additional items–specifically, for purposes of this part of the Order, the bar stools and 5 wall refrigeration units.

26.     At trial, Mrs. Palmer testified that she believed the ACV of the 5 wall refrigeration units to be $8,600.00. *See* Trial Tr. at 144. After having time to research the items over the lunch break, Mr. Pender then testified that he estimated the ACV of the 5 wall refrigeration units to be $7,500.00. *Id.* at 169. Considering Mr. Pender's testimony to be credible and because they were disclosed late, the court finds the ACV of the 5 wall refrigeration units to be $7,500.00

27.     Defendants did not assign an ACV to the bar stools. The court notes that Defendants' attorney, Mr. Sabb, stated to the court that he "believe[d] the testimony [was] going to be [the bar stools were] about $420." *Id.* at 171. However, Defendants did not testify to that amount while on the witness stand. Further, Mr. Pender testified that he estimated the ACV of the bar

---

as to these four chairs has already been analyzed above by the court.

stools to be $50.00 a piece. *Id.* at 172. The photographs submitted by Defendants as Exhibit number 1 appear to show three bar stools, and therefore the court finds that the ACV of the bar stools located in the store was $150.00. Defs'. Exh. 1.

28.      The court finds that the total ACV of the equipment inside Olanta Royal Market at the time of the fire was $35,409.00.[7]

29.      However, the court further finds that Mr. Pender's undisputed testimony proves that all the stainless steel equipment can simply be cleaned. *See* Trial Tr. at 170-71. At trial, the following colloquy took place between Mr. Pender and Plaintiff's attorney:

> Plaintiff's attorney: How resilient is stainless steel to smoke, can you clean it?
>
> Mr. Pender: Clean it off.
>
> Plaintiff's attorney: What about the utensils, stainless steel utensils [Mrs. Palmer] has listed on [the proof of loss], can you clean it?
>
> Mr. Pender: It can be cleaned, yes, sir.

*Id.* More specifically, when asked about the cost of having the stainless steel cleaned, Mr. Pender testified that "[i]f [he] was going to get somebody to come in and clean the stainless steel, a vendor to come in and do it, they are going to charge probably charge for the trip and time and labor, a couple hundred dollars to clean it all." *Id.* at 178. Moreover, when asked whether she agreed that the stainless steel items could be cleaned, Mrs. Palmer stated that she could not give an opinion. *Id.* at 71-72. Based on this testimony, the court concludes that the following items are not total losses: 30 inch stainless steel table ($125.00); 78 inch stainless steel

---

[7] $35,409.00 is the sum total of the ACV of the items listed in the handwritten proof of loss ($14,651.00), at pages 10-11 of this Order, and the ACV of the items listed in the typewritten proof of loss ($13,108.00), at pages 11-13 of this Order, and the ACV of the 5 wall refrigeration units ($7,500.00), and the ACV of the bar stools ($150.00).

table ($163.00); 78 inch stainless steel table ($163.00); stainless steel cooking utensils ($160.00); stainless steel transport cart ($200.00); 4 stainless steel napkin holders ($25.00); 3 compartment stainless steel sink ($550.00); and stainless steel wall shelf in the deli area ($75.00). Thus, the court finds a deduction is due for these items in the total amount of $1,461.00, and an increase due in the amount of $200.00 according to Mr. Pender for cleaning of the stainless steel items. After accounting for these items, the court finds that the current total of ACV for equipment is $34,148.00.[8]

30.     Finally, as to the above equipment, a question remains as to whether the above items are covered by the Building coverage provision, which coverage has already been exhausted, or by the Business Personal Property provision. The court finds that, with the exception of the 3 compartment stainless steel sink, the items set forth in Plaintiff's Exhibits 6 and 10 as well as the bar stools and 5 wall refrigeration units are Business Personal Property as defined by the Policy. The Policy defines Business Personal Property, in pertinent part, as "Furniture and Fixtures," "Machinery and Equipment," and "All other personal property owned by you and used in your business." Plf's. Exh. 5 at 31. The Building is defined in the policy, in pertinent part, as follows:

> (2) Fixtures, including outdoor fixtures;
>
> (3) Permanently installed:
>     (a) Machinery and
>     (b) Equipment;
>
> (4) Personal property owned by you that is used to maintain or service the building or structure or its premises, including:
>
>     (a) Fire extinguishing equipment;
>     (b) Outdoor furniture;

---

[8] ($35,409.00 – $1,461.00 + $200.00 = $34,148.00)

16

(c) Floor coverings;
(d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering . . . .

*Id.* The court finds that the Building coverage provision of the Policy covers personal property that *is used to maintain or service the building* as opposed to the furniture, fixtures, machinery, equipment, and other personal property owned and used in *the business* as contemplated by the Business Personal Property provision. With exception of the 3 compartment stainless steel sink, the court finds that the above noted equipment is independent from the maintenance and service of the *building* and is used solely in conjunction with the operation of the *business*. While the court believes these items of equipment fall under the Business Personal Property provision, the Policy language at the very least creates some ambiguity as to what provision they fall under. Accordingly, the court finds that the above-noted equipment, which has an ACV of $34,148.00, is covered under the Business Personal Property provision of the Policy.

**Gas Pumps, Gas Pump Console, and Wiring**

31.     The court finds that Defendants presented no evidence of damage to the Gas Pumps. Additionally, Mr. Benjamin, who works for a petroleum equipment company, testified that he witnessed no damage to the Gas Pumps. *See* Trial Tr. at 38, 42. Plaintiff's attorney specifically asked Mr. Benjamin if he saw any damage to the Gas Pumps, and Mr. Benjamin answered, "No, sir." *Id.* at 42. Further, the photographs submitted by Plaintiff do not show any visible fire damage to the Gas Pumps. *See* Plf's. Exh. 8. Accordingly, the court finds that the fire did not cause any damage to the Gas Pumps.

32.     However, Mr. Benjamin did testify that the Gas Pump Console suffered damage from the fire. According to the testimony:

> The console controls the gas pumps. It turns them on and off. And it registers gallons and that kind of stuff, so when somebody fuels up their car, they check out, they look at the console and see how much fuel the person got, or on the front end, they use it to authorize a pump, to turn on and off.

Trial Tr. at 40. Mr. Benjamin further testified that he assumed the fire destroyed the Gas Pump Console because it was contained within the Building. *Id.* Neither party offered any evidence that contradicted that testimony of Mr. Benjamin. Accordingly, the court finds that the Gas Pump Console was actually destroyed by the fire. Additionally, Mr. Benjamin testified and provided supporting documentation that the cost of the Gas Pump Console was $2,994.00. *Id.*; Plf's. Exh. 4. Mr. Benjamin also testified that there would be labor costs of $1,000.00 associated with the installation of a new gas pump console. However, the court finds that this labor cost would only be awarded on a replacement cost basis. The Policy instructs that Plaintiff "will not pay on a replacement cost basis for any loss or damage . . . [u]ntil the lost or damaged property is actually repaired or replaced." Plf's. Exh. 5 at 44. Defendants admitted several times at trial that they had not re-entered the Building since the fire and had not replaced anything in the Building. *See*, *e.g.*, Trial Tr. at 81. Accordingly, the court finds that Defendants are not entitled to these additional labor costs, but are entitled to the value of the Gas Pump Console, $2,994.00.

33.     There was also testimony regarding damage to the Wiring that ran between the Gas Pumps and the Building. As to the Wiring, Mr. Benjamin testified to the following:

> Mr. Benjamin: You know, I would say it would be more of a wiring issue.
>
> Defendants' attorney: Right.
>
> Mr. Benjamin: Because you know the wire was damaged in the fire.
>
> Defendants' attorney: Right.

> Mr. Benjamin: I mean, I'm assuming, in the electrical room. I was not in there to inspect it, so I don't know fore sure. I would think that the bigger issue would be the wire. I would assume there would have to be new wire pulled out to those pumps.
>
> Defendants' attorney: Yes, sir, and what would you estimate that cost to be?
>
> Mr. Benjamin: Probably another thousand to $1,500 would be my guess.

Trial Tr. at 46. The court finds that, based on this testimony, Defendants have met their burden of proof in establishing that the fire caused damage to the Wiring that connects the Gas Pumps to the Building. Additionally, the court finds that the damage to the Wiring was in the amount of $1,500.00.

34.     The court finds that Mr. Benjamin, who provided all of the testimony relevant to the Gas Pumps, Gas Pump Console, and Wiring, was a very credible witness and was qualified to give his opinion as to the type and amount of damage to each piece of equipment based on his educational and work background. Accordingly, the court accepts his estimates as to the costs of the damaged items, and finds that Defendants suffered recoverable damages to the Gas Pump Console and Wiring in the total amount of $4,494.00.

**Gas**

35.     Defendants contend they can recover for the Gas still in the gas tanks at Olanta Royal Market. Essentially, Defendants contend that because such a long period of time has passed since the fire, DHEC regulations require that the Gas be pumped out and disposed of, and therefore Defendants have lost the use of that Gas.

36.     Plaintiff objected to the testimony and introduction of evidence as to the Gas claim. This Gas was one of the supplemental items claimed by Defendants on the day of trial. The court permitted evidence of the Gas claim by Defendants over the objection of Plaintiff, and the

court initially felt there was no prejudice to Plaintiff by the admission of this evidence. Mr. Palmer testified that, based on DHEC regulations, "since the time has expired on the tanks now, we have to suck all of the gas out, right, by a particular vendor. They will dispose of the gas, and we will cement the tanks in." Trial Tr. at 222. Mr. Palmer further testified that Defendants could no longer use the Gas in the tanks due to DHEC regulations. However, the court notes that it received no evidence regarding the DHEC regulations other than this testimony by Mr. Palmer. Defendants' counsel did not direct the court, or Plaintiff, to any actual DHEC regulations or provisions. And, because Defendants did not inform Plaintiff about the claim for this Gas until the day of trial, Plaintiff did not have an opportunity to independently search for any DHEC regulations or prepare a response to Defendants' DHEC arguments. Therefore, the court finds that Plaintiff was prejudiced by the introduction of this evidence and the court is disregarding the same.

37.     Even if there was no prejudice, the court would still find that Defendants did not suffer any damage to or loss of the Gas. No evidence has been presented that the gas tanks or the Gas contained therein were damaged by the fire. Moreover, the court finds that Defendants could have freely removed this Gas at any time after the fire. Mr. Palmer testified that his sole reason for not removing the Gas was that he believed Plaintiff would not have acted in "good faith" and would not have believed that he pumped the gas out based on DHEC regulations. *Id.* at 228, 230. However, the court found that Mr. Palmer was not a credible witness, as he routinely contradicted the testimony of the other witnesses, including his own wife. Additionally, Mr. Palmer admitted that Plaintiff did not instruct him to not remove the gas, or inform him that he

could not remove the gas. *Id.* at 230. Therefore, the court finds for all of the above reasons that Defendants have not met their burden of proof regarding the Gas claim.

**Loss of Business Income**

38.     The court refused to grant summary judgment previously on this issue, reserving judgment until it could hear the evidence. Having now heard the evidence, the court denies recovery for loss of Business Income.

39.     The court finds that Defendants had closed their business prior to the September 2007 fire, and therefore they are not entitled to coverage for loss of Business Income. While the court notes that Defendants testified that the store was still open at the time of the fire, the court finds that testimony to be not credible in light of the overwhelming majority of the evidence in this case. After testifying that the store was "taking care of itself," Mrs. Palmer admitted to about $8,000.00 in unpaid taxes as well as a delinquent mortgage. *Id.* at 59-60. Mrs. Palmer testified at trial that the business was performing very poorly and had never actually made a profit. *Id.* at 50-51. When confronted with the store's income tax returns, (Plf's. Exh. 13, 14, & 15), Mrs. Palmer admitted to losses in 2004, 2005, and 2006, in amounts of $18,494.00, $20,323.00, and $36,663.00, respectively. Trial Tr. at 60. Mrs. Palmer later admitted that she was forced to supplement the store with income from Defendants' other businesses. *Id.* at 119. Mrs. Palmer further testified that Olanta Royal Market was for sale at the time of the fire. *Id.* at 51. Not only was the business for sale, but Defendants had removed a significant portion of inventory prior to the fire, including all the alcohol and coke products. *Id.* at 51-52. Mrs. Palmer further admitted that Defendants had closed the deli portion of their store prior to the fire. *Id.* at 55. Finally, Mrs. Palmer testified that the store had been closed for "approximately at least a couple of weeks"

prior to the fire. *Id.* at 52. Additionally, Mr. Palmer admitted upon cross-examination that Defendants had simply given up on the store and wanted to sell it. *Id.* at 237. The court finds that all of this testimony supports a finding that Olanta Royal Market was permanently closed at the time of the fire. This finding is also supported by the photographs submitted by Defendants. Defs'. Exh. 1. One of those photographs depicts a store without any beverage inventory, and another shows an empty deli area and ice cream box. The court notes that these photographs were taken by a realtor a week or two prior to the fire. *Id.* at 148-50. Based on all this evidence, the court finds that Defendants had closed Olanta Royal Market prior to the September 2007 fire. In so concluding, the court finds that Defendants' testimony to the contrary was not credible. Defendants did not present credible evidence on the issue of entitlement to payment for loss of Business Income, and the court finds they have not met their burden of proof in showing they are entitled to an award for loss of Business Income.

**Debris Removal**

40.     As noted in the Stipulations, *see supra* p. 2, the parties stipulate that the highest estimate secured by Plaintiff for the costs of Debris Removal is $9,500 and the highest estimate secured by Defendants for Debris Removal is $16,500. The maximum allowable coverage for Debris Removal is $10,000. Both parties agree that Defendants have not incurred any expense for Debris Removal at this time. Plaintiff agrees that it owes, at least, $9,500 if the court determines that payment is owed before Defendants actually incur the expense of Debris Removal. Therefore, the court must determine whether or not the coverage for Debris Removal is owed before any removal costs are actually incurred. *See* Trial Tr. at 5.

41.     Admittedly, the court has struggled with the answer to this question.  Part of the uncertainty is caused by the fact two separate, but pertinent, relevant sections of the Policy discuss Debris Removal.  The Policy first provides that Plaintiff "will pay [Defendants'] expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period." Plf's. Exh. 5 at 31.  From a plain reading of that provision, it is arguable that Defendants are not required to first incur the expense for debris removal and then seek reimbursement.  If Plaintiff had intended for Defendants to be required to first incur the debris removal expense and then seek reimbursement, Plaintiff could have easily included such language in the Policy.  As a matter of fact, the court thoroughly conducted independent research on the Debris Removal issue and found many cases that cited similar policy language, but which language included the term "incur" or "incurred."  However, the Policy provides the additional $10,000.00 for debris removal upon the following condition: "The total of the *actual* debris removal *expense* plus the amount [Plaintiff] pay[s] for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage." *Id.* (emphasis added).   It is arguable that this second provision unambiguously requires that the "expense" for Debris Removal "actually" exist–i.e., be incurred–prior to payment under the Policy.  Based on the court's own struggles interpreting the Debris Removal provisions, the court finds that an ambiguity exists which must be resolved against Plaintiff.  Accordingly, the court finds that Defendants are entitled to payment for Debris Removal expense even before they incur any actual expenses for such removal.

42.     Lastly, after examining all of the evidence in this case, by way of testimony and photographs, the court finds that the appropriate amount to be paid by Plaintiff for Debris

Removal is $10,000.00, which is the limit of the Policy. The store and all of its contents were severely damaged by the fire, and this amount is only $500.00 over the amount that Plaintiff has already stipulated as owing if covered by the Policy.

## CONCLUSIONS OF LAW

**Insurance Contract Construction**

An insurance contract is subject to the general rules of contract construction. *Standard Fire Ins. Co. v. Marine Contracting & Towing Co.*, 392 S.E.2d 460, 461 (S.C. 1990). "The court must enforce, not write, contracts of insurance and must give policy language its plain, ordinary and popular meaning." *State Auto Prop. and Cas. Co. v. Brannon*, 426 S.E.2d 810, 811 (S.C. Ct. App. 1992). "The meaning of a particular word or phrase is not determined by considering the word or phrase by itself, but by reading the policy as a whole and considering the context and subject matter of the insurance contract." *Stewart v. State Farm Mut. Auto. Ins. Co.*, 533 S.E.2d 597, 601 (S.C. Ct. App. 2000).

**Parties Intentions**

"An insurer's obligation under a policy of insurance is defined by the terms of the policy itself, and cannot be enlarged by judicial construction." *Stewart*, 533 S.E.2d at 601. "[I]f the intention of the parties is clear, courts have no authority to torture the meaning of the policy language to extend or defeat coverage that was never intended by the parties." *Id.*

**Interpretation of the Policy**

When the language of a policy is "plain, unambiguous, and capable of only one reasonable interpretation," it must be given full force and effect. *Ecclesiasties Prod. Ministries v. Outparcel Assocs., LLC*, 649 S.E.2d 494, 502 (S.C. Ct. App. 2007). "A contract is ambiguous

when it is capable of more than one meaning or when its meaning is unclear." *Ellie, Inc. v. Miccichi*, 594 S.E.2d 485, 493 (S.C. Ct. App. 2004). "Ambiguous or conflicting terms in an insurance policy must be construed liberally in favor of the insured and strictly against the insurer." *Stewart*, 533 S.E.2d at 601.

## Valuation by Property Owner

"Ordinarily a property owner, who is familiar with his property and its value, may give his estimate of its value or the damage inflicted upon it even though he is not an expert." *Austin v. Stokes-Craven Holding Corp.*, 691 S.E.2d 135, 146 (S.C. 2010). Therefore, Defendants were qualified to testify as to the value of their damaged or lost property throughout the trial, and the court treated their valuations accordingly.

Applying the above legal principles to the court's Findings of Fact, the court makes the additional findings below.

With respect to the court's Finding of Fact #30, the court believed that all of the items of equipment listed in the portion of this Order dealing with equipment fell under the Business Personal Property coverage and, at the very least, the Policy language created an ambiguity that must be resolved in favor of Defendants, resulting in the $34,148.00 amount being owed under the Business Personal Property coverage.

With respect to the court's Finding of Fact #40, the court found that an ambiguity existed as to whether the Policy required Defendants to first incur Debris Removal expenses prior to seeking reimbursement, and the court now finds that the ambiguity must be resolved in favor of Defendants, which results in a finding that Defendants are entitled to payment for Debris

Removal expense even before they incur any actual expenses for such removal in the amount of $10,000.00.

With respect to the Building coverage, Defendants are owed $23,364.16 and have met their burden of proof by a preponderance of the evidence with respect to same.

With respect to Business Personal Property coverage, Defendants are owed the total of $49,649.51 and have met their burden of proof by a preponderance of the evidence. This amount is broken down as follows: (a) Merchandise- $3,233.51; (b) Sporting Goods- $7,774.00; (c) Equipment- $34,148.00; (d) Gas Pump Console and Wiring- $4,494.00.

With respect to Business Income coverage, Defendants have not met their burden of proof by a preponderance of the evidence and are not entitled to recovery under this coverage.

## **CONCLUSION**

Based on the foregoing, it is therefore **ORDERED** that Defendants are entitled to payment under the Policy in the following amounts:

I.  Building coverage = $23,364.16

II.  Business Personal Property coverage =

(a) Merchandise = $3,233.51

(b) Sporting Goods = $7,774.00

(c) Equipment = $34,148.00

(d) Gas Pump Console and Wiring = $4,494.00

Subtotal = $49,649.51

III.  Business Income coverage = $0

IV.  Debris Removal coverage = $10,000.00

26

In total, Defendants are entitled to payment in the sum of $83,013.67, and judgment is entered in that amount for Defendants.

**IT IS SO ORDERED.**

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge

Florence, South Carolina
August 19, 2010